Good morning and welcome to our week of oral argument here in beautiful Jacksonville. Before we start, Judge Chouflette and I want to thank Judge William Traxler from the Fourth Circuit for being with us. He began his federal judicial career as a district judge in 1992. He was elevated to the Fourth Circuit in 1998 and he He received his Juris Doctor degree from the University of South Carolina and he also served in some very, very important positions for the Federal Judiciary's Judicial Conference. So, we're very happy and honored to have him here with us to help us during this week. We really appreciate it. You're familiar with our lighting system. When the yellow light goes on, that means that your time is to wrap up. If we take you beyond the lights, then don't worry about it. You're on our time and not yours. And with that, we'll begin with the first case number 18-12811, United States versus Jimmy Remy Fernetus et al. And we'll start with Mr. Wagner. Good morning, Counsel. Your Honors, Mr. Fernetus received a 40-year minimum mandatory sentence for selling cocaine on several occasions and using firearms on two of those occasions. The district court had no discretion but to impose the sentence. The district court clearly didn't want to impose the sentence as is made clear by the transcript, particularly the portion we we cited in our brief where the district court actually criticized the government for the way it filed the superseding indictment. I believe that that sentence violates the separation of powers doctrine, particularly because it categorically excludes one-third of the judiciary in the rendition of a federal sentence. That one-third of the government, I would also argue, is the most important portion of the government when it comes to federal sentencing because that is absolutely the core function of the judiciary is to decide cases and controversies between the government and citizens of the United States. And like the district court, our hands are tied to a very large degree as well by Supreme Court precedent. But let me ask you this question. Is your contention that mandatory minimum sentences are per se unconstitutional or that in your client's case, the mandatory minimum sentence was applied in an unconstitutional manner? It was applied in an unconstitutional manner. I would point out Federalist 51, which is the essay that Ms. Stretter relied on very heavily, says right after the quote that was so widely used in my brief, the provisions for defense of the separation of powers doctrine must, in this as in all other cases, be made commensurate with the danger of the attack. If understood as a substantive protection against government overreach and government overpunishment, then you have to look at each particular instance of government in itself, not as a categorical or per se argument. And in this particular case, depriving the judiciary of a core function in cases of drug sentences and ancillary offenses violates the separation of powers doctrine. The reason is it's a liberty interest at stake in comparison to the harm caused by society. That's a judgment call. That's a moral decision that the courts are certainly entitled to make. They've been making that decision since Marbury v. Madison, and I think the court could make that today. Your hands may be tied by the procedural precedent of this court because of prior rulings, but I would point out to your honors, Rule 35, the 11th Circuit Internal Operating Procedure, Section 5, says any active 11th Circuit judge may sua sponte, sua sponte is my word, may sua sponte request the court to be polled on whether en banc rehearing should be granted. So while you may not, as a panel, be able to provide the relief my client wants, any of you, or at least Judge Schoflat and Judge Jordan, may on your own initiative sua sponte, ask the court to be polled as to whether this issue should be heard en banc. I think the issue should be heard en banc. I think the old cases are stale and it needs to be reheard by the full court. Thank you. One more, one more question for you since you brought up the possibility of en banc rehearing. What's the dividing line that makes Mr. Fernandez's sentence unconstitutional under the separation of powers? And since you're not making a per se argument, what sort of a mandatory minimum sentence would satisfy your separation of powers concern? Well, I'm reluctant to give a number and I don't mean to be flippant by that. I think you have to look at the harm caused to society and you have to look at the sentence and you have to look at the role the judiciary should rightly play in the rendition of that sentence. In this particular case, I think any minimum mandatory for a drug offense would violate the separation of powers doctrine. I don't think that would be the case with, for instance, crimes of violence and other minimum mandatories where the harm is more clearly defined. I base that on a moral But that's a per se argument. No, no it's not. It's an argument based on this particular offense and the harm caused. I can't see, I can't see, I can't see all minimum mandatories violating the separation of powers doctrine. But this particular case with the drug, the quantities and the conduct violate separation of powers doctrine, in my opinion. Thank you very much. Mr. Green. If it pleases the court, Charles Green for Kissinger, St. Floor. I'll talk as fast as a Waukala County boy can, but I'll largely stand on the brief. Mr. St. Floor's conviction should be reversed for four reasons. First, the trial court erroneously admitted a prior conviction without the government offering any basis for its admission other than perhaps propensity to commit a crime, which is a use for which it is expressly forbidden. And the court did not articulate a 404B exception that would allow it to be introduced. The judge only said, the trial court only said, it's not explosively prejudicial. And it was indeed explosively prejudicial under the circumstances of this case where there was no other evidence of his ties to drugs except for hearsay and him being caught with some drugs in his possession. Which brings me to the second reason, the conviction. The government didn't even, in your view, articulate a theory of admissibility? Did not even articulate a theory of admissibility. On paper or orally? They submitted a memorandum, but it does not articulate an exception. If you read it, it can be used for propensity. And the judge certainly did not articulate an exception to allow it, which he was required to do. The second reason the conviction should be reversed is because there's no evidence tying this defendant to this conspiracy. The hub of the conspiracy, Mr. Giles, did not know him. None of the other witnesses knew him. There was photographic, there was poll videos at each of the locations where the drugs were. That's often the case that they don't know each other, which is a good idea, I suppose. But usually somebody, somebody knows somebody and the leader of the hub of the conspiracy would usually know somebody, but nobody knew him at all. The only evidence linking him to it was somebody said that somebody said that that's my boy. And his car was seen going back and forth, but he was never seen in the car. So there was nothing linking him to this particular conspiracy because nobody in there knew him. He wasn't on any telephone calls. He didn't have the telephone number of the other people in the conspiracy. He wasn't on any of the recordings that everybody else was on, the video recordings. Even in your view, what did the evidence show that Mr. St. Fleur did? Although you believe it's insufficient, what did the evidence show that he actually did? The evidence, if he'd been charged with the appropriate crime, would be that he may have been involved in some other conspiracy that was not charged, but he was buying and selling drugs. That's what it was. He on one occasion was caught with drugs in his possession, and that is at most evidence of, there is a, so it was a buy-sell transaction, which brings us to our third argument that the reason it should be reversed is that the trial attorney of the case asked for a buy-sell instruction to give the jury, to explain the law that the difference between a conspiracy to sell drugs and a buy-sell arrangement between a dealer and a buyer, and that instruction should have been given here, particularly where Your proposed instruction, tell the jury the difference. It did. It did, Your Honor. It delineated the difference. Explain that to me, what the difference is. I can't explain it to you thoroughly without having the language from the brief right in front of me, but a conspiracy requires an agreement between, a conspiracy to distribute drugs requires an agreement to go out and sell drugs. It requires, the illegal act has to be the object of the conspiracy, which is to further distribute drugs. You can go buy drugs without having any intent whatsoever to sell them elsewhere, and the jury could have been told that just because some people were selling drugs and might have agreed to do that and had some organization whereby they did it, that everybody who bought drugs from those people was not necessarily a part of the conspiracy. The difference is the intent to sell. After you make the purchase, the difference is the intent to sell it to another person. I think that's articulated much better than I just did. Yes, Your Honor. I believe the Crawford instruction did articulate that distinction. Why did the district court refuse to give you instructions? He didn't really articulate a reason. He just said he had deliberated over it and thought it over overnight and thought about under the circumstances of the case that this wasn't appropriate, but he didn't articulate a legally clear reason for doing so. We quoted his reasons in our brief, but there really were none. The fourth reason the conviction should be reversed is because a mandatory minimum sentence is unconstitutional. Both, I argue, per se. I think this separation of powers issue that Congress has gone too far in bonding the hands of the courts. I know this argument has been repeatedly rejected, but I keep raising it before this court and others. It's also, even if not per se unconstitutional, it's unconstitutional under the circumstances of this case where the only evidence against the defendant appellant Lafleur was he was caught with drugs on one occasion. There's no other evidence that he was buying or selling or had an agreement. His prior conviction for possession added ten years to his sentence. We got a ten-year additional minimum mandatory based upon a conviction for simple possession. Because he would have otherwise been subject to what, 0 to 20 or 5 to 40 within the ranges? Ten. He would have been subject to ten, so we got ten plus ten total. He would have been at, prior convictions aside, he would have been at the ten to life general range. Yes, Your Honor. And he got a ten plus ten mandatory minimum. And the judge actually, Judge Mendoza did, I did the sentencing, I did not do the trial. And I made much more extensive arguments with a little more time. And he actually was very troubled by the application of the mandatory minimum sentence in this case. He set his hand for tide. But he had trouble with it both generally, but particularly on the All right, thank you very much, Mr. Green. Ms. Hawkins? Yes, Your Honor. May it please the court, I represent Gerardson Norgasi. And he stands convicted of counts 1 and 18, which is a conspiracy and a substantive violation. But there was no proof adduced at trial beyond a reasonable doubt of his identity as the person who committed either of those crimes. Therefore, his convictions on both counts are due to be reversed. Of course, the government would have to prove in open court with an in-court identification that the person indicted by the grand jury is the person who committed the crime. And in this case, there was only one witness at the whole trial that even attempted an identification of my client. And that person was the ringleader, Eric Giles. Mr. Giles only identified my client as Fat Boy. He never said, that's Gerardson Norgasi. And nobody What does that mean, though? Well, it means that there was no identification beyond a reasonable doubt that he was a member of the conspiracy. Surely, alias is admissible, but the government would then have to link that up. Fat Boy is Gerardson Norgasi. And that didn't happen in this case. But he identified him physically in the courtroom? Yes. And he said, he's Fat Boy? He's Fat Boy. But nobody, there was no testimony that Fat Boy was Gerardson Norgasi. That testimony necessarily has to say that. No, he didn't identify him in his true name. And that would be required because you can't just identify him as Fat Boy without linking it up to the name in the indictment, the person who is charged with the crime. A lot of times in these cases, they identify them by an alias. Yes, sir. That's sufficient. I mean, Fat Boy is kind of an alias. It is. But you would have to link it up with the actual true name of the defendant. Back when I was in AUSA, for example, I did that by bringing in the booking officer who would say, I filled out this form and he told me his name was Gerardson Norgasi. And that's the person who told me that. And that's how you link it up. That was not done in this case. In fact, Mr. Giles testified, I never knew his real name. I never knew his real name like that, Norgasi. What's the best case that supports that proposition of law that an in-court ID through an alias is insufficient unless you link the alias to the person's true name as charged in the indictment? I did cite two cases in my initial brief. And I'll rely on those. Sorry, I don't have . . . That wasn't what I was going to argue here in my oral argument. But I did cite two cases, one in which the witness to the drug transaction identified the lady as O.C. And the agent was then able to have somebody, another witness, link up O.C. as being the woman's true name. And so, the identity must be proved beyond a reasonable doubt. The special instruction number three to the Eleventh Circuit instructions, pattern jury instructions, does require that. All right. Thank you very much. Yes, sir. Mr. Meltzer. Thank you, Your Honors. Good morning. My name is Brett Meltzer. I represent Raymond A.F. Your Honors, my client's sole issue that we're arguing is that conviction for conspiracy should be reversed because there was insufficient evidence beyond a reasonable doubt to prove that he was a part of the conspiracy. There was a buyer-seller relationship. That was all that was proved. But, Your Honors, there was no evidence at all to establish a conspiracy as to an agreement or that he was involved in any drug operation. Your contention is that the government failed to establish a conspiracy generally or a conspiracy in which your client was a member? My client was a member. Got it. Okay. And that the only evidence that they had to link my client to any, the only testimony they had was Mr. Giles, who basically made a general statement that he sold drugs, but there was no evidence that was more than just guessing, assumptions, or speculation. That was just conjecture. And I did cite two cases, U.S. v. Awin and U.S. v. Hardy, that basically states that guessing and assumptions and speculation and conjecture is not sufficient to prove a conspiracy. There was no evidence that he could provide linking my client as to where the drugs were sold, how he did sell the drugs. He didn't receive any of the profits, Mr. Giles. All that Mr. Giles did was receive orders over the phone. He was the ringleader, but with regards to my client, my client was calling him to buy drugs, which we admit he did, but there was no evidence that he was selling that as a part of a conspiracy and that he was engaged in any drug operations. On this buy-sell issue, instruction, you agree with your colleague's representation that the difference between a conspiracy and a mere buy-sell relationship is what happens subsequently after the sale of the drugs to the defendant? That, in addition to the fact that there has to be an agreement between the conspirators to sell the drugs. So what happens after the— if after the fact he were to sell drugs, but there was no conspiracy that linked any of the other members, I don't— So you're saying the difference is what happens prior to the buy-sell event or what happens contemporaneously and not what happens later on? I believe so because if whatever happened, if he were to be selling the drugs after the fact, but not linked in any way to a conspiracy, then he might be charged with distribution of drugs. It sounds like you two are talking about two different things, and when you come to the question of a jury charge and making lay people understand the difference, it's kind of hard for me to see where the problem is when it doesn't look like the two of you agree on what the difference is. Well, I think we both agree that there has to be an agreement between the conspirators because that's a central element of what a conspiracy is. I believe we would agree to that. What happens after? I mean, I think that if there is no agreement between the conspirators, whatever happens after doesn't really matter. What happens afterwards can be evidence of an agreement. True. But there has to be an agreement proven circumstantially or through direct evidence at the front end. And a knowledge by my client, at least, that he was aware of this agreement and the conspiracy, which would have to happen before. All right. Thank you very much. Thank you. Mr. Druskoski, is that correct? That's right. I know you only have one minute, but we'll give you an extra one. It seems you can only get your name out before you have to sit down. Thank you. I represent Ed Zingalen, and today I wanted to address the retroactivity of the First Step Act. We believe that the provisions of this act should apply to Mr. Gellin, even though he did not make the technical deadline of when he was sentenced, when that act was supposed to start taking place. The language of the statute says it starts taking place when the sentence is imposed. Well, we believe that the sentence has not yet been imposed until this court rules and then until possibly the U.S. Supreme Court denies certiorari. That is when final disposition occurs. Right now, sentencing the judgment was rendered, but it hasn't been technically sentenced in case final imposed yet. We're still in the appellate pipeline, and for those reasons we think it should apply to him. That's one way of looking at it. Another way is that it was imposed but hasn't been affirmed, vacated, reversed until the direct appeal process is exhausted. True. I'm just trying to draw a distinction between the rendering of the order and then our way of looking at the final imposition. As far as you're aware, have any cases throughout the country addressed that issue yet? Yeah. I looked about a month ago or so, and I think one or two decided this adversely to us. I don't think this court has ruled on it yet. I think you're right about that. Okay. So we're hoping we'll carve a new path out on this and based on the principles articulated on this and nothing else. All right. Thank you so much. Thank you. Before Ms. Tiffin begins, because I might forget to do this, I want to thank all of you for your service to your clients and to the court. I know that you're all court appointed, and we certainly couldn't do our jobs without your service and dedication. We do appreciate it. Ms. Tiffin. Thank you. Good morning. May it please the Court, Don Tiffin on behalf of the United States of America. There are several issues at play here, but I'd like to, with the Court's permission, begin with the introduction of Mr. St. Floor's prior conviction. The United States' position is that reasons were given and articulated on the record by the prosecutor as to why this evidence was being introduced and also that the district court sufficiently articulated its reasons for allowing that evidence in. The reason given by the prosecutor both in writing and at trial when this was litigated was that it was going to be entered for intent, for knowledge, and for motive. And by pleading not guilty and putting the United States to its burden, that information was admissible in this case to prove both the conspiracy against Mr. St. Floor and the charge of possession with intent to distribute. If that's the case, and I know that our cases support your position, a prior conviction on a narcotics charge always comes in in a subsequent narcotics prosecution. Even though those of us who have been on the trial court know that the line is very thin between knowledge, intent, motive, and propensity. Well, I agree with Your Honor. It's certainly a close call sometimes, but the Court here did the proper balancing test. If this evidence is relevant and if it isn't unduly prejudicial, then it can come in, and that's exactly what the Court here considered and ultimately decided in favor of allowing this evidence in. Now, that being said, although the United States' position is that there was no abuse of discretion in admitting that evidence, this Court could also affirm on a harmless analysis. I'll underscore what this Court already knows, which is that prior conviction was no smoking gun in this case. It was one piece of evidence in a case that included around 100 pieces of evidence in addition to testimony from dozens of witnesses, including other drug traffickers, including law enforcement agents from multiple agencies around the state of Florida. If the case was that overwhelming, why did you need the prior conviction? Well, I think maybe with the luxury of hindsight, we can conclude that the United States didn't have to have this. With hindsight, the prosecutor knows what evidence he or she has going forward and what's coming in and what it needs and what it doesn't need? That's correct, but this was introduced and I should say objected to in the middle of the trial. So at that point, we don't know. There's no crystal ball, so to speak, about what exactly these defendants were going to try to do to support their theories of the case. We did know generally the theories of the case by that point, which was with regard to Mr. St. Floor, that he was not a seller, that he was merely a user. So I think as long as this evidence passed the balancing and admissibility test, the United States was entitled to use it. But again, I emphasize that the United States did not rely heavily on it at all. In a closing of somewhere between 45 and 60 minutes, only one sentence was devoted to it. When the evidence of these convictions as to Mr. St. Floor and Mr. Norgese came in, the prosecutor described it as a housekeeping matter and simply handed the pieces of paper, the certified judgments, over to the clerk. So there was no drama associated with this, there was no heavy emphasis, and the jury got the correct instruction on this. This is the Eleventh Circuit pattern instruction. The jury was instructed very clearly not to use this for character evidence, and we can presume that the jury, when correctly instructed, did follow those instructions and did not use that evidence for any purpose other than what it was offered for, motive, intent, and knowledge. I'd also like to address the buyer-seller instruction, which overlaps that 404B evidence somewhat. The court had asked what the elements of conspiracy are, and they are these three elements. An agreement between two or more people, the defendant knew of the conspiratorial goal, and the defendant knowingly joined or participated in that illegal venture. The jury was correctly instructed on that. Had they not found each one of those elements, the jury could not have convicted the defendants of the conspiracy. This is true whether there was a buyer . . . But the fact that the judge correctly instructed the jury on the elements of the conspiracy doesn't necessarily answer the question of whether or not the defense gets to propose and obtain an instruction on a theory of defense. Our cases, at least, are pretty clear. There may be an issue as to phrasing the issue that Judge Traxler mentioned, but as a general matter, our circuit is pretty clear that a mere buy-sell transaction does not a conspiracy make. Why isn't the defense entitled to . . . Putting language aside, and maybe that's your argument, but why isn't the defense entitled to a buy-sell instruction if the evidence viewed in the light most favorable to the defense shows just that sort of a transaction? Because the evidence also established the conspiracy and that instruction . . . That's the evidence in the light most favorable to you. You're not supposed to look at the evidence in the light most favorable to the government when the defense seeks an instruction. Same thing for alibi, same thing for entrapment, etc., etc. You look at the party asking for the instruction. I understand, Your Honor, and my point is that the conspiracy instruction covered the law. There was no sort of abyss that left open this question about whether or not the jury could acquit if it didn't find this conspiracy. And I would also mention . . . So your argument is a per se argument, too, that a conspiracy instruction necessarily subsumes a buy-sell theory. In this case, yes, based upon these facts, Your Honor. I don't understand that at all. Well, I'll try to make it a little bit clearer, but let me also . . . Did you oppose the buy-sell instruction? The United States did oppose that instruction. On what theory? That the evidence established the conspiracy and did not specifically . . . I should say this, that the evidence precluded a theory of mere buyer. As a matter of law viewed in the light most favorable to the defense? Well, it really was a matter of fact, Your Honor. The government's argument was that the facts do not support that instruction. Viewed in the light most favorable to the defense? That was the argument below, yes. You think that argument is correct? I do believe that, yes. Well, there was no way that the evidence could have been construed by the jury had they disbelieved some of your witnesses, for example, that this was, at least to some defendants, it was a mere buy-sell transaction. Well, that is my position, Your Honor. It seems . . . I know it's your position. I'm asking you whether it's correct. Well, it wouldn't be my position if I didn't think it was correct, Your Honor, so I do. But I understand the . . . So the only way that a jury could have construed this evidence, even if they disbelieved your witnesses, was that there was a conspiracy? If they had disbelieved the witnesses, they would not have been able to convict of a conspiracy. And they might have just found a buy-sell transaction. Correct. Then why wasn't the instruction given? Well, that wasn't a charge. The charge was conspiracy and the charge was possession. I know. They're not asking for an instruction on the charge. They're asking for a theory of defense which cuts against the charge. I understand, Your Honor. We just have a different point of view about this then. It appears that way. But let me also underscore for the court that these defendants did make that argument before the jury that Mr. St. Floor and Mr. Ayotte were mere buyers. So it isn't as if that argument was never presented to the jury at all. It was made pretty aggressively as their theories of the case, and the jury rejected it wholesale. Well, I have plenty of time left, Your Honor, so I'm happy to continue answering the court's questions. But if there are none, then I will rest on the briefs and ask this court to affirm the judgments. You've got a little time, so we'll take a little bit of your time. Or at least I will. Okay. So the government has a huge amount of discretion as to how to charge cases. Yes. In some scenarios, its hands are tied by ethical rules and attorney general memoranda and the like. But in a lot of cases, the government has huge amounts of discretion as to how to charge cases and whether the stack counts or not. So why did the government choose to charge this case in the way that it did, given the district judge's frustration with the sentencing options that . . . Well, the United States felt and feels that these guys were bad guys doing bad things and that the charges against them . . . Selling drugs. . . . is selling high amounts of drugs, yes, including cocaine and . . . A 40-year sentence you think is appropriate? We're not talking about the Cali cartel here. A 40-year sentence? You're starting to . . . But you're starting . . . I don't mean you personally, but I mean the government is starting to prosecute these cases in a way that people are being warehoused for decades. And there's going to come a time when that practice, I think, is going to come to bite you in the rear, bite you, the government, in the rear because it's one thing to try to impose . . . I speak only for myself, not for my colleagues. And I know that our hands are tied here, given circuit precedent, on a fair number of the arguments that, for example, Mr. Fernandez makes. But you're starting to warehouse people for being narcotics dealers. Those are the sorts of sentences that are normally handed out to murderers and rapists and kidnappers and terrorists. And I think something is getting lost in the equation. And that keeps happening. The government is going to one day happen upon a defendant who gets a sentence like that, and it's so disproportionate that all that favorable sentencing precedent you have is going to get turned on its head. Well, I certainly understand the court's position and concern in that regard. Allow me the opportunity, if I may, to note a couple of things about this case. Because of the mandatory minimums that were at play here, the government did not introduce evidence that it might normally at one of these sentences where we didn't have these minimum mandatory sentences. And at one point, the district court judge mentions that, you know, I don't know that you would like the sentence that I would give you, but my hands are tied and so this is the sentence. And my point in mentioning those details is that we don't know what the sentences would have been in these cases. They may have been what this court considers severe. The United States elected not to ask for any more because the sentences inclusive of the minimum mandatory and the stacking was sufficient to suit its sentencing goals. But the United States was perfectly capable of, in this case, but in particular a case minus the mandatory minimums, of bringing in evidence to support these harsh sentences to... That may be true, but we just don't know that. Well, and I guess that's my fundamental point, Your Honor. We don't know what the sentences would have been in this case. And so while we are focusing quite heavily on the minimum mandatory aspect of it, and I understand why, these sentences may have approached something close to that, at least for some of these defendants. The range for these defendants was 10 years to 50 years. We had some 20-year sentences and a 40-year sentence. So we just can't know what the court would have done. But to the extent that any defendant here may be suggesting that there would have been a 10-year sentence as opposed to a 50-year sentence or anything like that, we can't know that. We just can't know it because of the minimum mandatories that had to be applied in this case. I'm not suggesting that a 10-year sentence would have been appropriate, but there's a big difference between a 20-, 25-, and 30-year sentence and a 40-year sentence. I agree, Your Honor. We start to use these numbers like if they're candy, but 10 years, 15 years, 5 years of a difference is a difference. So don't take my remarks as suggesting that a 5- or 10-year sentence would have been appropriate in this case. Not at all, Your Honor. It's just that a 40-year sentence is four times that otherwise applicable statutory minimum. Yes. I would further note, however, that Mr. Fernandes and Mr. Gellin's sentences also included sentences for firearm offenses that the other three defendants did not have. So these defendants were armed and dangerous during these drug transactions. Their sentence reflects that. All right. Well, I will ask this court to affirm the judgment and sentences of these defendants. I thank you for your time today. Thank you very much, Ms. Tiffin. Your Honors, the government has argued that perhaps the sentences would have been similar had the judge had some discretion to go below the minimum mandatory. That's exactly what we're asking you to do. Remand it so that the judge can actually make this decision without being hamstrung by the minimum mandatory. We don't know, of course, what the judge would have done, and I'd like to find out. But I would like to say one thing in my brief . . . What do you say in response to Ms. Tiffin's argument that at least for some the sentences imposed also included gun charges? It wasn't just a straight narcotics case. In my brief, I've referred to these charges as drug trafficking offenses and ancillary offenses, and I purposely put those together to distinguish them from 924C's that are charged in connection with crimes of violence. There's a fundamental difference. What's that difference? No one was hurt in this case. No one was threatened. In a lot of violent crime cases, nobody's hurt either. You may have a Hobbs Act charge. You may have a carjacking where, by the luck of God, no one is actually injured. What's the difference between wielding a firearm in a narcotics case and being ready to use it with doing so in a Hobbs Act robbery of a 7-Eleven or a carjacking and trying to take someone's vehicle? I understand your point. It comes to the underlying offense, which is drug. I've cited in my brief a newspaper article where a convenience store owner was actually celebrated in one of the gun rights magazines for using a firearm to defend his store, and the photograph is him standing in front of a rack of cigarettes holding his gun, saying, oh, look at me. These guys were carrying guns for protection in the drug trade. Now, the drug trade is not equivalent to a crime of violence. The underlying offense is a drug offense. It's a fundamentally different crime than a crime of violence. If there had been a violent act in addition to it, we'd be talking about a violent crime. That didn't happen. Gun crimes in connection with drug trafficking offenses are fundamentally different and do not warrant the kind of sentence that was imposed here, in my opinion. Thank you for your time. Thank you. If I could please the Court very briefly. I stand by my argument that the government did not identify any exception that would allow 404B evidence to be admitted of respect to this particular defendant. They filed a memorandum addressing multiple pieces of evidence in multiple defendants but not this judgment of conviction or why it would apply, other than to simply say that by pleading not guilty, all the defendants put their motive identity into issue. They never articulated a reason that this evidence was subject to the exception, nor did the Court, and they were both obligated to. To the extent they offered it for intent, we've cited cases, many cases, that state that evidence of a prior conviction for possession, which is what this was, is not evidence of intent to sell. So even if it was offered for that purpose, the conviction for possession would have been insufficient under the case law that we've cited, to your honors. With respect to Judge Traxler's question, I think my buddy Eugene Rossi, who argues in front of you, would be disappointed to answer it so poorly, but what we asked the district court for on the biosell instruction was to tell the court that a conviction for conspiracy requires proof of an agreement to commit a crime beyond that of mere sell, and we cited in support of that argument precedents from this Court, including from United States v. Guatemala, which go through the critical distinction between a conspiratorial agreement and a buyer-seller transaction, and they go through why there is a distinction, and why in certain cases, like this one, it is important to tell the jury what that distinction is. Thank you. I wanted to provide the court with the best case. Judge Jordan's question, it's on page 17 of my initial brief, it's U.S. v. Hines, 955 Pet Second, 1449, 11th Circuit, 1992. In the Hines case, two defendants used aliases in committing a sexual assault. They said their names to the victim, there were aliases, and the quote that I have from that case is that the government connected the appellants to all of the aliases referenced at the trial. That's a quote from the case. I just wanted to say that this is a copy of the superseding indictment. If a person was identified as fat boy, and that's all, which defendant is it? It's not a named defendant, so how would we know who that evidence goes to? We don't, because it was not connected to the named defendant, and that's the point of my argument. Thank you very much. Thank you all. You have yours left? No, no, it's okay. Thank you, Your Honors. I just wanted to point out, with regards to my argument, that regarding the buyer-seller relationship, which is what my client did do. He did buy the drugs from Mr. Giles. There is absolutely no evidence in the record that he sold any of these drugs once he bought it. There was one comment by Mr. Giles that he did sell it, but there was no evidence that he could point to specifics of where he sold it, how did he sell it, did you make any money from it. Zero evidence. That is very important, because we're assuming that he was out there selling these drugs, but there's no evidence of that. There's no evidence of any money made, no evidence that he made . . . Is there evidence of the quantity that he had? The only evidence that they had him in possession . . . No evidence of quantity? Only 8.4 grams, which is . . . That's all? Well, that's not . . . According to the law enforcement officer, that would . . . I mean, the evidence is unfavorable to the verdict. What does it show that he possessed? Well, 8.4 grams, but the officer did say, and so did Mr. Giles, that that could be a user amount. But our argument would be that there's no packing materials, firearms, burner phones, drug ledgers, anything that would show an operation. No evidence existed other than my client buying the drugs, which would merit a different sentence. Thank you. Thank you. Thank you. Thank you all very much. Thank you.